909 So.2d 36 (2005)
Johnnie R. ELMORE a/k/a Johnny R. Elmore and Patricia Elmore, Plaintiffs-Appellants
v.
Steven Paul KELLY, Sr., Safeway Insurance Company, Houston Trucking and American Insurance Brokers Company, Defendants-Appellees.
No. 39,800-CA.
Court of Appeal of Louisiana, Second Circuit.
July 29, 2005.
James E. Ross, Jr., for Appellants, Johnnie R. Elmore a/k/a Johnny R. Elmore and Patricia Elmore.
Ungarino & Eckert L.L.C., by Brian David Smith, Matthew John Ungarino, Gregory Stephen Barkley, Shreveport, for Appellee Houston Hines.
Cook, Yancey, King & Galloway, by Robert Kennedy, Jr., Shreveport, for Appellee Scottsdale Insurance Company.
Before CARAWAY, PEATROSS and DREW, JJ.
DREW, J.
On May 27, 2002, Johnny Elmore was driving a 1988 Freightliner tractor-trailer *37 rig hauling scrap metal from West Monroe to Jackson, Mississippi. The rig was owned by Houston Hines d/b/a Houston Trucking. A tire blew out on the rig on I-20 in Madison Parish. Elmore moved the rig to the interstate shoulder, activated the emergency flashers, and exited the vehicle. As Elmore checked the tire, he noticed that the trailer and tractor had become disconnected, allegedly because of an adjustment made to a lever by Houston Trucking. He entered the tractor in order to realign it with the trailer. After Elmore exited the vehicle to ensure that the trailer and tractor were realigned, Elmore was struck by a 1994 Nissan owned by Steve Kelly, Sr. and driven by Kelly's minor son. Elmore was momentarily pinned by the Nissan against one of the rig's tire wells. His right leg was subsequently amputated because of trauma received during the impact.
Elmore and his wife filed suit against Kelly, Safeway Insurance (Kelly's insurer), Houston Trucking, American Brokers Insurance Company, and Scottsdale Insurance. Scottsdale was Houston Trucking's liability insurer, and American brokered this business auto policy.[1] Elmore alleged that but for Hines's modification of the vehicle, the trailer would not have disconnected from the tractor and he would not have been struck by the Nissan while checking the connection. He also asserted that American and Scottsdale failed to procure the minimum insurance coverage of $750,000 required by federal law. The trial court sustained American's exception of no right of action and motion for summary judgment, and this court affirmed that judgment.[2]Elmore v. Kelly, 39,080 (La.App. 2d Cir.12/15/04), 889 So.2d 1173.
Hines and Scottsdale subsequently filed motions for summary judgment in which they asserted that, as an employee, Elmore's exclusive remedy against Hines was in workers' compensation.[3] Scottsdale also asserted that it did not provide coverage to Hines for damages arising from bodily injury to an employee under his business auto policy. Finding that Elmore was Hines's employee, the trial court granted the motions. The Elmores appeal, arguing that a genuine issue of material fact exists regarding whether or not Johnny Elmore was an independent contractor who did not fall under workers' compensation.

DISCUSSION
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, and the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 *38 (La.App. 2d Cir.8/21/96), 679 So.2d 477.
In general, an employee's exclusive remedy against his employer for on-the-job injury is workers' compensation; an exception is made for intentional torts. See La. R.S. 23:1032.
The Louisiana Workers' Compensation Act establishes a statutory presumption of employment status. Hillman v. Comm-Care, Inc., XXXX-XXXX (La.1/15/02), 805 So.2d 1157. La. R.S. 23:1044 states that a "person rendering service for another in any trades, businesses or occupations covered by this Chapter is presumed to be an employee under this Chapter."
An exception to this presumption has been statutorily carved out for an independent contractor. At the time of the accident, La. R.S. 23:1021 provided, in part:
(6) "Independent contractor" means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter.
The distinction between employee and independent contractor status is a factual determination that must be decided on a case-by-case basis, taking into consideration the total economic relationship between the parties and the various factors weighing either in favor of or against an employer-employee relationship. Singleton v. Booker, 37,198 (La.App. 2d Cir.5/14/03), 847 So.2d 107, writ denied, 2003-2030 (La.11/7/03), 857 So.2d 495.
In Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (1972), the supreme court found the following factors relevant in determining whether the relationship of principal and independent contractor existed: (1) there is a valid contract between the parties; (2) the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it; (3) the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction of the principal, except as to the result of the services to be rendered; (4) there is a specific price for the overall undertaking agreed upon; and (5) the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.
The most important element is the right of control and supervision over an individual. Estate of Wilburn v. Leggio, 36,534 (La.App. 2d Cir.3/19/03), 842 So.2d 1175, writ denied, XXXX-XXXX (La.6/6/03), 845 So.2d 1095; Powell v. Fuentes, 34,666 (La.App. 2d Cir.5/9/01), 786 So.2d 277, writ denied, XXXX-XXXX (La.9/21/01), 797 So.2d 674. It is not the supervision and control which is actually exercised which is significant; the important question is whether, from the nature of the relationship, the right to do so exists. Pender v. Elmore, 37,690 (La.App. 2d Cir.9/24/03), 855 So.2d 930, writ denied, 2003-2968 (La.1/16/04), 864 So.2d 632.
Johnny Elmore attended Coastal Trucking, a truck driving school, after the plywood plant where he was working closed. Elmore graduated on January 18, 2002, and received his commercial driver's license ("CDL"). Shortly thereafter, Elmore *39 began working for Houston Trucking, which was owned by Houston Hines. Hines's business generally consisted of purchasing steel from Monroe Scrap yard and then reselling it.
Hines and Elmore met through another student at Coastal Trucking. Although they never entered into any written agreement, Hines agreed to pay Elmore $60 each time he drove a truck pulling a dump bed trailer from Hines's business in West Monroe to a scrap yard in Jackson, Mississippi, and then back again. Prior to Elmore working for him, Hines had had another driver who quit after only a few weeks because he was physically unable to tolerate the rough ride of the trucks.
Hines owned three Freightliner trucks, but only two of the trucks were functional. Hines drove one, and Elmore always drove the other truck. During the period that Elmore worked for Hines, Elmore was the only person other than Hines who drove a Houston Trucking Freightliner. Hines was the only person for whom Elmore had driven a truck since receiving his CDL.[4]
Elmore's work schedule for Hines varied. Some days he would work, and other days he would not work. It just depended on when Hines needed him. Elmore recalled on one occasion not making any trips for an entire week. There were some weeks when Elmore would work every day. On the days he did work, Elmore would sometimes make only one trip to Jackson. On other days he might make two trips. In fact, he was making his second trip of the day at the time of the accident.
Hines or his wife would usually call Elmore to let him know that some scrap loads needed to be driven to Jackson. Sometimes Elmore would call them first. In some instances when Elmore returned with the truck at the conclusion of a trip, the Hineses would tell Elmore to come back the next day. If Elmore was busy and unable to drive the truck when asked, he would do it later.
Elmore estimated that a round trip would take approximately six hours. After returning from Jackson, Elmore would drive the truck to Monroe Scrap in order for it to be reloaded and then weighed. Elmore would then bring the loaded truck back to Hines, ready for it to be driven to Jackson.
Elmore kept a key to the truck, so sometimes Hines would not be present when Elmore left for Jackson. Elmore would just drive off in the loaded truck. Accordingly, Elmore would not have to leave at a specific time on his journeys to Jackson.
Elmore was paid $60 per load driven to Jackson, and he was paid in cash each Friday, not after he drove each load. Hines did not withhold taxes or Social Security from Elmore's pay, nor did Hines pay for workers' compensation insurance on Elmore. Elmore never received a W-2 form or a Form 1099 from Hines.
Elmore did not consider his work for Hines to be a regular job. He thought it was just something he did on the side until he found a full-time regular truck driving job. When Hines was asked during his deposition if Elmore was an independent contractor, Hines responded, "I don't know about independent contractor. He was a part time employee or part time worker, however you want to call it." Hines also testified that Elmore wanted a part-time job when they first met.
Elmore places great emphasis on the position taken by Hines earlier in the litigation *40 that Elmore was not his employee.[5] In the memo in support of his first motion for summary judgment, Houston argued that an employer-employee relationship did not exist between him and Elmore. In Hines's amended answers to interrogatories, he stated that he had no employees and employed no drivers. Hines also denied that Elmore was his employee in his answers to Elmore's request for admissions. Nevertheless, the label placed upon Elmore by Hines is not conclusive in this determination.
Hines never leased his trucks to anyone else as they were only used for his purposes. Elmore was not permitted to take the truck anywhere else or go on any side trips, although he was permitted to stop in order to eat or rest. Elmore testified that he only drove the truck for Hines to and from Jackson, and could not recall driving it anywhere else. Elmore also testified that Hines told him to drive straight to Jackson, drop off the load, and then drive straight back. Elmore agreed he would need Hines's permission to use the truck for another purpose.
Hines maintained the trucks, inspected the trucks, and paid for the fuel, tires, and insurance for the trucks. Elmore would call Hines if he experienced a problem while driving the truck, and Elmore believed that Hines would take care of any damage to the truck.
Based upon our review of the record, we conclude that there is no genuine issue of material fact regarding Elmore's status as an employee of Hines. Accordingly, the trial court properly granted the motions for summary judgment.

DECREE
With costs assessed to the Elmores, the judgment is AFFIRMED.
NOTES
[1] American Brokers Insurance Company had been listed in the original petition as Houston Trucking's liability insurer.
[2] Hines did not appeal the denial of his August 2003 motion for summary judgment.
[3] Scottsdale later filed a second motion for summary judgment regarding the issue of the amount of minimum insurance coverage. The trial court also granted this motion, but the Elmores do not appeal that part of the judgment.
[4] Elmore also worked part-time cutting grass in May 2002.
[5] Hines also indicated that Elmore was not his employee when he spoke with a state trooper investigating the accident.